Good morning. We have a pretty full calendar this morning. We have five cases. Four will be argued. One is on submission. I'm told the lawyers are here for each. So we'll begin with EVIP Canada, Inc. v. Schnader Harrison Segal & Lewis. So you've got Mr. Princey. You've got ten minutes, but you reserve two minutes for rebuttal. I see you've taken off your mask, and that's fine. Any advocate can take off their mask when they're at the lectern. You don't have to, but you're welcome to, and judges can take them off or leave them on as they see fit. So the floor is yours, Mr. Princey. Thank you, Your Honor. Excuse me. Good morning, Your Honors. Anthony Princey of the firm of Linn and Occupinti on behalf of the Plaintiffs' Appellants. Your Honors, if this Court does not reverse the grant of summary judgment by the District Court, then any person who's been given a gift, be it of real property or personality, and whether, for example, it's an engagement ring, whether it's a car for one's graduation from college, from your parents, whatever it may be, if you're given a gift and that property is damaged by a third party, you are not able to sue that third party for that damage under the District Court's decision. And the reason for that is you didn't pay for the property. It was a gift. That would turn the law standing on its head. That is not the law. Does it matter what theory of recovery you put forward? In other words, if you receive a gift and it's defective, and you sue the store where the gift was bought for a refund, is that the same in terms of your ability to recover as if you sue for the diminution in value relative to what it should have been? No, Your Honor. It's the same because the measure of damages is not the concept that one applies to the question of standing. They're very different. And that's actually where the District Court's analysis fails. What the District Court incorrectly did is it conflated the concept of standing, which requires a showing of injury in fact, on the one hand, with the measure of damages on the other. The standing standard, i.e. injury in fact, looks to see whether there is an injury. The measure of damages looks to see what the quantum of that injury is for damages purposes. Two very different concepts. But the injury still has to be redressable. Like if it were the case that the only possible remedy you could get is the return of the funds, and the return of the funds would go to a third party, maybe the party that's injured wouldn't have a redressable injury. But I assume your argument here is, well, obviously our injury could be redressable if we got an award of damages. Quite clearly, Your Honor, because we're seeking a monetary award. So there's no question. And that's why the appropriate measure of damages that we submitted is what was the value, what was the cost of this property when first in our hands as against what happened to it because of the defendant's negligence. Let's just sort of clear. I mean, the money here comes from TerraCAP, right? It originally is derived from Crouse. But it's TerraCAP signing an agreement that it's going to post $4.5 million. Exactly. Exactly. And that's another basis for identifying injury in fact. Had TerraCAP not complied with the terms of that contract, TerraCAP could have been sued and therefore it would have had a liability entered against it. So I just do not think that there can be a reasonable debate on the facts in this case. So that's standing. But I think it is worth getting to then damages or whether you lose on an independent ground for basically failure to prove a claim. In other words, here you're bringing a malpractice claim, right? Yes, Your Honor. And it seems that your malpractice claim turns on whether but for the misstatement or the malpractice of counsel, your client would have either walked away from the deal or the other side would have consented to the demand that you're saying was crucial to doing a deal in the first place, right?  The critical question up front with respect to Your Honor's inquiry is what was the scope of the defendant's responsibility? The problem I think you run into is it seems like the record is pretty clear that your client knew that the agreement did not contain this anti-dilution safeguard. It knew that the ability to basically reduce your client's share to almost nothing because of a series E provision that allows a via to make this change. Your client knew about it and signed the agreement anyway, right? No, Your Honor. The record's – that's not the record. And the record is anything but clear with respect. If anything, what the record shows, Your Honor, is that a client in my client's situation could not, in the facts of this case, be held as a matter of law to have known. That is – Well, here's – I'm just looking at the Appendix 245, right? What we need is that the E cannot be anything more than Parry-Passeu with the D shares held by Taricap. And so that's from Handel to McDougall. And then the response from McDougall, a few – I guess that same day, the timing sometimes is a little hard to figure out, but it says they don't want to move on this. Correct. So in other words, the other – and that's also then reflected on 246 and 241, right? And then the record seems to reflect that your guys make this deal because it's about – the plug is about to get pulled on it. So there's a number of items, Your Honor, that Your Honor's not referencing. So immediately after that, immediately after that, the defendant did not take either what Bramow, which was the other company, was saying about the odds of being willing to provide that provision, or what Mr. McDougall said. And the reason we know that is immediately after that, on the same day, Mr. Handel responds to Mr. McDougall and says, well, why don't we try this, this being a swap? So he does not believe, at that juncture that Your Honor just described, the defendant does not believe that there's – that the negotiation over this issue is said and done. But with respect to, Your Honor, whether or not – I mean there's more direct – I mean so I was taken by the correspondence where McDougall is writing to Krauss, and Krauss says he wants the protection. And McDougall says the next terms require the approval of the majority of Series D. If we're at 4.5 and Aviva or others are at 5 or 5.5, we would obviously not have a majority. I will see where I can get to with Craig, meaning Bramshaw. And then he writes to Bramshaw, and he says we want this kind of protection where they wouldn't be – the majority, Aviva, would not be able to change our rights. And Bramshaw responds, I don't think so, but I'll check. Correct. So that indicates two things. First of all, that your clients were aware that the majority shareholder of the Series D had the right to approve a change in the rights. And second, that it's McDougall that was negotiating with Bramshaw. So, Your Honor, the record is replete with evidence, replete with evidence that the state – the finding by the district court that McDougall – and this is at page 21, I believe, of the court's decision. McDougall and not the lawyers were the negotiators on the transaction. That's just – that's just incorrect as a matter of fact, but minimally, minimally, the evidence in the record should have allowed a – A lot of evidence is incorrect. So we have all this correspondence where Mr. McDougall is writing to Bramshaw asking for different terms in the agreement. And we don't really have emails where – I mean, the lawyers are providing advice to the people from Terracab saying maybe you should ask for this or ask for that. But they're not negotiating directly with Bramshaw, are they? The reason it's incorrect, Your Honor, is that this transaction, like most other corporate transactions of its type, involves both the business people and the lawyers in negotiating it. Okay? There are business terms which my clients did not negotiate. They didn't negotiate the price, et cetera. But there are innumerable terms that Mr. Handel negotiated. And that – to draw the inference the court did is just contrary to how the court should have handled this on some – for example, in the appendix – Let me ask you this specific question. So they do have the anti-dilution protection, right? But what you – apparently what you're saying you should have gotten is a kind of minority veto over a change in the rights that attach to preferred stock. And that's what we directed. So it would prevent the automatic conversion. That's what we directed. Is there anything in the record where Mr. Krause or anybody from Terracab asks somebody from the defendants, go negotiate this term with Bramshaw and get it in the contract? Yes, and that is that – And they say something about a minority right. Specifically about minority right, no, but that doesn't mean the responsibility didn't exist on the part of the defendants to insert that kind of a provision. But isn't the point, it seems to me, that at the time your client signed, had they been misled or had representations been made to let them think that this protection had been built into the contract when they knew previously it wasn't there? Yes. Okay, so what is that? The defendants said these documents are okay to sign. He said that a week after he was told by his client, we need approval rights. There's no dispute about the fact that a week prior, my clients told the lawyer – Right, but so you're relying on a statement, these documents are okay to sign. And you're saying that that implies everything you ever hoped for is in this thing. It doesn't imply. But what does it say? It expressly says that. It's saying it's okay to sign. It's not – and I'm not trying to be flippant, Your Honor, but that's not a statement that the formatting of the document is fine. That's not about style. That's about substance, and you have to know what your client's business objectives are in that situation, and you have to meet them. Well, the way that they expressed their business objectives was they said they wanted anti-dilution protection, right? Initially, initially. And they did have – there's no dispute there is anti-dilution protection. There is, correct, correct. But the only problem is that if a majority of the Series D shareholders agree to change the terms of the sale, they're allowed to. And so you're saying that your client wasn't aware that that was in the contract? Your Honor, these – when you say the contract, there wasn't the contract. There were multiple contracts. The court acknowledges that it was the combined effect of those contracts that gave life to what the rights were with respect to the preferred stock. And these contracts were so complicated that the defendant himself did not understand what Your Honor is suggesting my clients necessarily as a matter of law had to have understood. And that is just painful in Congress. I guess here's my issue. So I have this evidence where they ask the lawyer about anti-dilution protection. There is anti-dilution protection. There's this separate issue about whether the majority of the shareholders would be able to change the rights of the preferred stock shareholders. And I have – we have in the record the correspondence between McDougall and Krauss indicating that they knew that if Aviva had a majority of the Series D, they'd be able to change the rights. So I guess from that, you would draw the conclusion that they got the anti-dilution protection that you talked about with their lawyers. And they were aware that they would not be able to stop a change in the rights if a majority of the Series D shareholders were to change it, specifically Aviva. And so why doesn't that lead to the conclusion that they were aware of everything and got what they asked the lawyers to get? There's an enormous leap, Your Honor, that's not satisfied by the record here, supported by the record, I should say, in saying that the clients knew that. They had a discussion about a singular document a week before the closing. And at that time, they instruct the lawyer, we need an approval right. Now, I would submit, Your Honor, from day one, when Mr. Krauss said on October 31, 2013, and this is found in the court's decision at page 16 of the court's decision, where Mr. Krauss said our two million shouldn't be treated any worse than the next 23 million that goes into the deal. And the response from Mr. Handel is it makes sense. I would submit that a lawyer at that point, and this is what our expert says, okay, a lawyer at that point whose competence, okay, not a great lawyer, just base competence, should understand that what the client is looking for goes beyond mere anti-dilution protection. But if that wasn't clear to Mr. Handel throughout, it had to be clear a week before when he was told an approval right is what we need. We have to have an approval right. But then Bramo tells McDougal, we'll get back to you, but don't think so, right? Right, which means it's an open question. Don't think so. Is there anything in the record to suggest that I don't think so changed? There's nothing in the record, Your Honor, that suggests that I don't think so isn't I don't think so. There's nothing in the record to suggest that I don't think so means deal done, case over, no way, no how, which I assume he would have said if that was the case. And just so Your Honor appreciates this, when they brought the Series C, when they brought the Series C in October of 2013, okay, Ms. Hewitt, who is Mr. Handel's partner, okay, advised the client that, look, in your MOU, you're supposed to get full ratchet anti-dilution protection. The charter is only giving you weighted average. She says what you need to do here, okay, is put this protection in your agreement, in your purchase agreement, to override the charter. So the law firm understood how to do it. They just failed to do it. The real question, Your Honor, were they responsible for advising my client at the time of the closing on the correctness of those documents? Or were my clients responsible for figuring it out themselves? I mean, the correctness of the documents, what we're talking about, whether your client knew the terms of what they were signing, right? Correct. And when you're saying they thought they were signing something that gave them the protection that they had requested but which Bramo said don't think so on. Because there's eight different ways from Sunday they could have gotten that protection. You don't have to do it simply in the one document they looked at. What you're relying on to say that they thought they had it is because there was an e-mail that says okay to sign. And a verbal, so in the record you'll see it's both an e-mail and then there was also, they both testified, or at least McDougal testified to the fact that he got, he was at a phone call from his lawyer who said it's okay to sign.  And certainly the jury should be allowed to make the determination, your honor, as to whether or not that's not. So McDougal thought that this issue had been resolved. So after Bramsher says don't think so, McDougal forwards that to Handel and Krause. Handel says, well, maybe you could say that the E can't be anything more than peri passu with the D shares held by Terracat. Maybe that would be a solution. Then McDougal says they don't want to move on this. Maybe we could propose some language. So like they were discussing this issue. And your honor, Handel comes back after that. But by the time that he says it's okay to sign, are you saying McDougal and Krause would have forgotten about this correspondence and assumed that there was some kind of solution? No. As it turns out, we know the record is very clear that Mr. Handel believed it is complicated and it's understandable that mistakes can be made. Mr. Handel believed that under certain provisions and of the contract and Delaware law, that they were protected. So that was in all likelihood, certainly an inference can be drawn, that that was the reason why he said they were okay to sign it. I'm sorry. After all of this correspondence where they're saying we should get this thing from Bramah that they don't want to give us, you're saying they would have all assumed that they had it all along because of some provision of Delaware law? Well, I'm saying two things. Number one is it won't be the first time and it certainly won't be the last time that a negotiation party says, no, I don't think so. That's a negotiating position. And certainly, with the same players involved, same players involved a few months earlier, they were able to get it. And the reason they were able to get what they wanted is because the lawyer asked for it. And here, the record's clear, the lawyer didn't ask for it. And our expert opines that a lawyer should ask for it. We'd be in a different situation. All right, I think we're 10 and a half minutes over, but I know Judge Robinson has a question. Yeah, I just want to ask one question. Yes, Your Honor. You described the lawyer's belief that the protection was there, that with the anti-dilution protection that the consent, there wasn't a majority override available on that. Yes, Your Honor. Is there evidence in the record other than the inferences that you're asking to draw from the, go ahead and sign the documents, that that belief was communicated to the clients, that the lawyer ever communicated to the clients that your anti-dilution protection overrides any majority, series D majority rights to waive that protection? No, Your Honor. But what there also isn't is what our expert also opines should have been the advice, which is when a week before, and you've known throughout, you've known throughout how important this anti-dilution protection is to the client. And when the client, if you will, doubles down a week before and says, well, then get me an approval right, when you know it's that critical to the client, okay, first of all, don't say the documents are okay to sign. But second of all, expressly say to the client, just so you know, before you sign this, what you told me a week ago, you don't have that. And it's literally malpractice per se, in my view, to not tell the client that. All right. You've got two minutes for rebuttal. You've got your money's worth so far. But we'll now hear from Mr. Elman. Don't give him that much time, Your Honor, please. I was going to say, I hope he didn't eat into my time. Good morning, Your Honors. May it please the Court. Howard Elman for the appellees. Your Honors, there are some fairly simple and straightforward principles of law at play here. The first one is that a lawyer cannot be held liable for failing to tell his client something his client already knew. Before we get there, are you defending the standing analysis? Absolutely, Your Honor. And I was planning on getting there second since Mr. Princey ended on brief, but I'll get to standing. Because, again, this is a simple, straightforward principle of law, which is the distinction between a corporation and its shareholders and affiliated entities. Here, we're here because of a series of choices that the appellants and their principal made. Mr. Krauss made a choice that made sense to him and makes sense to most business people to operate through the corporate form. That, of course, comes with advantages, but it also comes with rules. And it comes with consequences when the rules aren't followed. And chief of those rules is the separateness and distinction between the corporation and its shareholders. Here, the appellants have made a choice, another choice, to plead a claim, which started with their interrogatory responses when they itemized their damages to the penny. Their damages theory in this case is to put them back in the position that they claim they would have been in but for the malpractice, which they say takes the form of paying them for the costs incurred for the acquisition of the Bramo equity and the costs incurred. I mean, they can estimate their damages by whatever measure they want, but I'm sure that the complaint also has the provision that says whatever other remedies the court thinks is just and proper, right? Sometimes you have a different measure of damages once you get to that phase. So I guess I just have a sort of simple question. So is there really any dispute here that TerraCap owned these shares and based on their allegations but for the contact of the defendants, they would have been worth more than they ended up being worth? So if they were awarded money, it would compensate for that loss of value, right? There's no question that they own the shares. There's no question also that they own the Better Place assets. There's also no question that there's no evidence in the record at all as to the value of the Better Place assets both at the time of the purchase and at the time that this joint venture blew up. That's a standing problem? That's not a standing problem. It is both a standing and a damages problem because the standing, they have effectively plugged themselves out of standing because Judge Menasche is correct. On day one, the complaint says, you know, whatever further relief the court may award. But on day 923 or wherever we are, we have now gone through discovery and we have now, the appellants, the plaintiffs have taken a firm position on what their damages are. And those damages, using their own words. These are their words. Are there out-of-pocket losses? So when you talk about out-of-pocket losses, and again, just to back up for a second to your question to be more direct, in order to have standing, you need to have an actual injury. And in order to have an actual injury, you need to have damages. And when you frame your damages as your out-of-pocket expenses, then you better have been out-of-pocket in order to come into court. I'm sorry. So your position is that if TerraCAP had written in its complaint, we want to recover the diminution of value of the assets that's attributable to the defendant's conduct, they would have standing. Because they said we want to recover our out-of-pocket expenses, they don't have standing. Your Honor, had they litigated a different case? Yes. I mean, it doesn't sound like it's whether they have a concrete injury that's redressable. That sounds like whether they pleaded a proper claim. Doesn't that sound like a merits question as opposed to a standing question? Well, Your Honor, I think it's both. I mean, whether you— Both a standing question and a merits question? Well, it's both a standing question and a damages question because, again, standing is dictated by whether there's an injury in fact, and an injury in fact is dictated by whether or not you have damages. So in this case, it is— I mean, do you dispute that they have an injury in fact? I mean, they own the assets, and their allegations are the assets are worth less than they would otherwise be but for the conduct of the defendant. I don't dispute that had they litigated a claim that was we lost the value of our assets, right? We were damaged, and here's our expert evidence of what these intellectual property assets are, assets that the appellants are very candid that they knew nothing about, which is why they needed to enter into the joint venture. Had they proffered any proof at all about a diminution in value, then yes, they would have had standing, and I'd be telling you still, Your Honor, that they don't have any damages because it's entirely speculative. I mean, of course, the Better Place assets were purchased months before the alleged malpractice, and the appellees had nothing to do with that, so we would have—we certainly would have another basis for dismissal. But yes, had they prosecuted that claim, then yes, there'd be standing. But they didn't. But they didn't. They said we need to be reimbursed. Sure, I'm sorry. It seems like that's a concept that stretches standing to swallow up the merits in any case, right? If you're destined to lose on the merits, then you don't really have an injury in fact, and therefore you don't have standing, so we're going to dismiss it on standing. That's how I'm understanding the logic. How is this different from that? Well, it's not different, Your Honor, but not every case—but this wouldn't be the case in every case. Again, had they pled the case that Judge Bonacci was suggesting, then yes, I would be up here only arguing that there were no damages, which of course I'm still prepared to argue. But there are times, and this is one of them, where the same issue would lead to the same result, in this case dismissal, for the same reason, which is that there are no damages. So if I can proceed with the breach argument, I'm happy to now. As I started saying at the beginning, there's a fairly simple and straightforward principle here, which is that a lawyer cannot be negligent for failing to do something that the client knew about. And in this case, the record is very clear that the appellants had absolute, clear, and unequivocal knowledge that they wanted— which they're now blaming the lawyers for. And so the evidence you're referring to is the email chain on 245 and 246. Is that principally what you're relying on, at least 243? Yes, Your Honor. That's exactly what I'm relying on, because what those emails show are that the appellants had knowledge of several things. They had knowledge that they may not be pari passu or have priority with the next round. They had knowledge that the majority would have that control. They had knowledge that they weren't the majority. But wait a minute, Mr. Princey's argument, that that correspondence shows that they really wanted this term in the contract. They hadn't gotten it. And so the lawyer should not have said, it's okay to sign. He should have said, you know, you said just a week ago you really wanted this term in the contract, and you don't have it. And so therefore, you should be aware that what you're signing does not include the thing that you said that you really wanted. Well, that's because the lawyer had knowledge at this time that the client asked for it and didn't get it. It's not a lawyer's duty to remind a client about something that the client already knows. Again, there was an exchange, you know, Mr. Handel at one point interjected and said, hey, perhaps you could swap, you know, in a future series. And the totality, the totality of Mr. Krause's response to that was, quote, unquote, interesting idea. That's it. No direction to the lawyer, go ahead and try to get that. No statement that this is a deal breaker for us. In fact, the very next email or the last email in that chain is an email from Mr. Krause to Mr. McDougall in which he didn't even bother to copy his lawyer. Appellant's lawyer, who they're now seeking to put these millions of dollars in damages on, Mr. Krause emails Mr. McDougall and says, need final docs to review, please. So with this knowledge, with the lawyer knowing, knowing that the clients knew what they had and what they didn't have, knew what they wanted, what they said they needed. And by the way, I want to clear up one thing. There was no direction to Mr. Handel, like, hey, we need this. This was an internal communication he was copied on. So the lawyer at this point now knows the client knows they don't have these rights. The client asked for these rights. The client didn't get these rights. The lawyer makes some suggestion where the client just says an interesting idea, and that's the last thing he hears. Lawyers aren't mind readers. I mean, to impose that kind of obligation on lawyers, to use Judge Robinson's term when we were talking about standing, which is stretch. So when he says it's okay to sign, what is he saying? What's he signing off on? What's he saying is okay? He's signing off on the form of the documents, which were entirely consistent with everything that was communicated to him up until that point, that was consistent with the term sheet. They had the anti-dilution protection they asked for. They never asked for minority consent rights. He absolutely fulfilled his obligations at that point, and the client knew what the client was signing. Well, let me ask you. I mean, this is what Mr. Krause says in his declaration. It was my unconditional position, and was fully understood and known to Mr. McDougall and Handel, that having full ratchet anti-dilution rights for any potential down round was absolutely critical for us to have, absent which we would simply not have done the deal. So your argument seems to be that that should be discredited because it's inconsistent with the emails, right? Well, I'd answer that two ways. First of all, it's entirely consistent with what he had, which was full ratchet anti-dilution protection that would continue unless waived. That's really the reference, right? And, Your Honor, it is absolutely rebutted by the emails because the emails show that he knew. I mean, they talk about consent rights. They talk about minority. They talk about we need some approval. I mean, there's a whole series of emails. This wasn't just one, you know, off-the-cuff flippant email out of context. This is an entire dialogue in which Mr. McDougall and Mr. Krause, and only copying the lawyer in some of them, are going back and forth about what this means to us and what this could mean in future rounds. So having had that knowledge, actual, absolute, unequivocal, and clear knowledge, plaintiffs have no claim. So which way does that cut? I mean, if there's so much correspondence about how important this was to them and they were focused on it, why shouldn't we say that the lawyer was obliged to say, you know, just so you know, like that issue that you thought was so important is still unresolved or you still don't have that protection? Because it was very clear in the communications between Mr. McDougall and Mr. – I'm saying Mr. McDougall should have – would have understood that they must know that they don't have that protection. Well, there was no question. There was no question about it at that time. There was zero question because McDougall goes to Bramow, goes to Bramshire and says, hey, we want and in parens need some meaningful consent rights, and Bramow says, don't think so. And that's it. Actually, the correspondence is kind of open-ended, right? So Bramow says, don't think so, but I'll check. Then I don't think the record indicates that he ever followed up or like that we have the result of whether he checked and there was some other thing. Krause also asks about some proposed language to provide some additional protection. I don't know if the record indicates that somebody came back with that proposed language. It does seem like it was – there was more to do on that issue that either didn't get done or it got done but it's not on the record. Well, Your Honor, when clients negotiate directly, business people negotiate, which is exactly what was going on here, the lawyer can't just interject in the middle of a negotiation. There's a negotiation between business people. The lawyer is in charge of superior knowledge than what the clients have when the clients are the ones who are negotiating. But they copied all these emails, right? Pardon me? The lawyers copied all these emails. Yes. So what the lawyer knows is that the client asked for it and the only response was don't think so. So at that point, when the clients are the ones – I mean, look, had the lawyer been the one who was charged with negotiating and the lawyer communicated with opposing counsel and opposing counsel said don't think so and the lawyer didn't follow up, that's a different story. But here the clients are negotiating directly and the only thing the lawyer knows is that they asked the counterparty and the counterparty says don't think so. So Mr. Princey suggested that sometimes the lawyer was negotiating with the other side. So your position is that it was all a negotiation between business to business and the lawyers were providing advice to them. Your Honor, I'm glad you asked that question because Mr. Princey used the phrase that there were innumerable things that the lawyers negotiated and I could put a number on that innumerable things. It's exactly zero. There was nothing in the record about the lawyers negotiating a single business term in this deal. This was a business person to business person negotiation. The lawyer was making sure that the documents, that the deal terms were consistent with the terms that the clients negotiated. The client in this case told the lawyer we need anti-dilution protection. That's what they got. The client never said it can't be waivable. The lawyer knows that the clients were negotiating amongst themselves. They asked for it and yes, they were told don't think so. And having that knowledge, when the lawyer is asked like hey, is it okay to sign, all the lawyer knows is like these terms are consistent with everything that I've been told, everything I've been directed by the client. So yes, okay to sign because it had exactly the protections that the lawyer was charged with negotiating. But your argument basically has to boil down to no rational fact finder could conclude other than that the client knew what was in these documents when it signed. And knew what wasn't in the documents when it signed. Absolutely. And no rational fact finder can find that Mr. By the way, it's interesting because Mr. Krause throughout the course of the litigation said I didn't even know about what consent rights were. And then here we have these emails that show that he knew precisely what they were and he asked for them and he didn't get them. So yes, your honor, no rational fact finder can find that there was anything left for the lawyer to do other than to say exactly what he said, which is okay and sign the deal that you negotiated. Aren't we a little bit in the realm of inferences to be drawn from the undisputed facts of record? We've got this trail where there's a desire for the minority approval rights. There's a gap of time, a week later they close the deal. The inference that you're drawing is the clients knew that they had never gotten it. I gather the inference the other side's asking is the lawyer knew this was foremost priority for the clients. It was incumbent on the lawyer, if not to interject himself into the negotiation, to say to the client, okay. Okay to sign, but understand you never got this thing that was really important to you. Just wanted to flag that. Why isn't that ultimately a jury question based on the testimony of the parties, the expert evidence, etc.? Because your honor, what that's really suggesting is that the lawyer has a duty to remind the client of what the client already knows. There are no inferences to be drawn from these undisputed facts. These emails unequivocally show that they knew exactly what they needed, exactly what they wanted, that they asked for it, and they didn't get it. So what your honor I think is really suggesting is that at that point, perhaps the lawyer could have reminded the client. Again, could a lawyer remind a client? Sure, but we're not talking about what the best lawyer in the world should do, or even what the average lawyer. We're talking about a standard of care, and there are no cases. It just doesn't exist that a lawyer has a duty to remind a client of what the client already knows. All right. I think I'm well over. Stop there. We've got two minutes of rebuttal that we'll hear. Thank you, Your Honor. We'll hear from Mr. Quincy. Your Honor, this court in Moreno-Gadoya v. Kortegender stated at page 84, in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. And what the robust colloquy and questions from the court today demonstrate is that there are different inferences that can be drawn from these facts. That's why counsel and I can take the positions we're taking with a straight face and both reasonable. Well, straight face isn't the test. You know, some people are very good at keeping a straight face. But it seems to me okay, the documents are okay to sign is about all you've got that supports an inference that your client was in the dark. So, Your Honor, that is not the case. Okay, so at page, excuse me, in the appendix in the record at page 928, this is the deposition testimony of Mr. Handel. And at page 195 of his transcript starting at line 18, it reads as follows. The question, whatever understanding, if any, he, and just an editorial note, he is McDougal. He had with respect to the laws of the U.S. or any state in the United States, you understood that Mr. McDougal was relying on you for legal expertise related to the matters in this transaction, correct? Answer, he was relying on me to review agreements after he reviewed them to see if I had any problems with them. And that admission is repeated in documentation throughout this record, starting as early as when he was retained. And if you look at the court's decision at page 15. That's about whether he had any problem with them. But can I just ask you this? Please. Just to put it this way. So if, in fact, we think that the record shows that Krauss and McDougal knew they didn't have this protection, they asked for it from Brammo and didn't get it. And Handel was aware of that exchange. When it came time for Handel to say it's okay to sign, are you saying a jury could decide that it's malpractice not to remind the clients that they failed to get that term a week earlier? It's malpractice not to have attempted to put the provision in the documents. It's malpractice not to have told the clients the provision isn't in the documents. It's malpractice to tell the clients they're okay to sign when a week prior. I guess my question is even accepting opposing counsel's account that, like, they knew about it and Handel would have seen that they knew about the absence of this term and that they knew that they failed to get it in the contract and that it wasn't in the contract. Would it still have been malpractice not to remind the client of it, of that fact? Yes. Right before they signed. And you're saying a jury could say that that is malpractice. Yes, because under New York law. Under New York law, a client is entitled to rely upon his or her lawyer to advise the client of the correctness, substantive correctness, of the transaction documents. Can I ask this question? If, in fact, the correspondent said something, there was, like, maybe an even clearer email from a week earlier where Krauss says, oh, well, I really wanted that protection, but it looks like we're not going to get it, that's life. Would there still be a duty on the part of the lawyer to remind him that that happened? No. Does your argument depend on something about the ambiguity or the open-ended nature of the earlier correspondence? I don't think it's as ambiguous as your Honor does, but it does depend on the facts, right? Okay, so in my hypothetical, so if, in fact, there was an email that made it crystal clear that the clients knew that this protection was not in the contract, it would not be malpractice not to remind them of that fact a week later. Right. And so I think in that situation, the defendants can meet their burden of proof because that is another failing in a district court's decision. What we're talking about, the knowledge of my clients— So what is it about the record that makes it different from my hypothetical? So you're saying they didn't actually know that this wasn't in the contract. The record makes it seem as if they might have thought that this protection was in the contract. But might doesn't meet their burden of proof. It's their affirmative defense. Knowledge—knowledge, constructive or actual—is the defendant's burden of proof. A very difficult one when you think about it under the facts of this case, since the defendant himself did not understand these documents. Yet, he's coming to this court, the court below, and now this court, and he's saying, forget the fact that I didn't understand them. I believe you should rule as a matter of law that my client, as a matter of law, understood them. So don't give my client an opportunity to go to the jury on this question of fact, even though myself, I couldn't understand them. I do not believe they have the evidence to meet their burden of proof. I think in your Honor's hypothetical, they have some evidence to rely upon. All right. Judge Robinson, do you have a question? All right. Well, let's—all good things have to come to an end, but we have another set of arguments we have to hear. Thank you for your time and attention. All right. Thank you all. We will reserve decision, of course. Have a good day.